**COMMONWEALTH of Kentucky,**
**Appellant,**

v.

**Larry Joe STAMBAUGH, Appellee.**

**Larry Stambaugh, Appellant,**

v.

**Commonwealth of Kentucky, Appellee.**

Nos. 2008–SC–000600–MR,
2008–SC–000622–MR.

Supreme Court of Kentucky.

Aug. 26, 2010.

Rehearing Denied Jan. 20, 2011.

Jack Conway, Attorney General of Kentucky, Perry Thomas Ryan, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, for appellant/appellee, Commonwealth of Kentucky.

Joseph Brandon Pigg, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellee/appellant, Larry Joe Stambaugh.

Opinion of the Court by Justice NOBLE.

## I. INTRODUCTION

One issue in these combined appeals requires us to determine whether a defendant convicted of committing two or more felony sex crimes against two or more victims is subject to the statutory cap on sentences found in Kentucky Revised Statutes (KRS) 532.110(1)(c). After closely examining the relevant law and arguments of the parties, we conclude that the cap does apply to such a defendant.

## II. FACTUAL AND PROCEDURAL HISTORY

A jury convicted Larry Joe Stambaugh of committing two counts of first-degree sexual abuse of H.M.S., who was less than twelve years of age; one count of first-degree sexual abuse of M.R.S., who was less than twelve years of age; and one count of first-degree sexual abuse of M.E.S., who was less than twelve years of age. The jury recommended that Stambaugh be sentenced to ten years' imprisonment for each conviction, to be served consecutively, for a total effective sentence of forty years' imprisonment.

After considering the arguments of counsel, however, the trial court sentenced Stambaugh to a total of twenty years' imprisonment because it believed it had "no choice absent further direction from the appellate courts to cap the sentence recommended by the jury at twenty ... years pursuant to KRS 532.110(1)(c)."

The Commonwealth filed an appeal to this Court, claiming that the trial court erred when it concluded that it only had the authority to impose a maximum twenty-year sentence upon Stambaugh. Stambaugh filed an appeal as a matter of right,[1] alleging error in the trial court's exclusion from evidence of a letter purportedly written by M.R.S. We consolidated the two appeals and resolve each in this opinion.

## III. ANALYSIS

### A. KRS 532.110(1)(c) Limits Stambaugh's Sentence.

■ This case revolves around the proper interpretation of KRS 532.110(1)(c) and (d). KRS 532.110 provides, in pertinent part, as follows:

(1) When multiple sentences of imprisonment are imposed on a defendant for more than one (1) crime, including a crime for which a previous sentence of probation or conditional discharge has been revoked, the multiple sentences shall run concurrently or consecutively as the court shall determine at the time of sentence, except that:

. . .

(c) The aggregate of consecutive indeterminate terms shall not exceed in maximum length the longest extended term which would be authorized by KRS 532.080 for the highest class of crime for which any of the sentences is imposed. In no event shall the aggregate of consecutive indeter-

minate terms exceed seventy (70) years; and

(d) The sentences of a defendant convicted of two (2) or more felony sex crimes, as defined in KRS 17.500, involving two (2) or more victims shall run consecutively.

The intent of KRS 532.110(1) is to first recognize the discretion of the trial court in imposing sentence in criminal cases, and then to list the exceptions the legislature imposed on that discretion. There are four areas of exception, including that the aggregate of indeterminate terms cannot exceed the maximum length for the longest extended term which would be authorized under the PFO statute for the highest class of crime for any of the convictions, and never more than 70 years; and that two or more felony sex offenses involving two or more victims must run consecutively.

Since Stambaugh's victims were all less than twelve years of age, his sexual abuse convictions were all Class C felonies.[2] The maximum permissible aggregate prison term in KRS 532.080 to which a person convicted of Class C felonies could be sentenced is twenty years.[3] So a defendant convicted of multiple Class C felonies typically would be subject to a maximum aggregate punishment of twenty years' imprisonment.

KRS 532.110(1)(d) provides, in essence, that a person convicted of two or more qualifying sexual felonies involving two or more victims must be sentenced to consecutive terms of imprisonment. There is no question that Stambaugh's four convictions

---

1. Ky. Const. § 110(2)(b).

2. *See* KRS 510.110(2) ("Sexual abuse in the first degree is a Class D felony, unless the victim is less than twelve (12) years old, in which case the offense shall be a Class C felony.").

3. *See* KRS 532.080(6)(b) ("If the offense for which he presently stands convicted is a Class C or Class D felony, a persistent felony offender in the first degree shall be sentenced to an indeterminate term of imprisonment, the maximum of which shall not be less than ten (10) years nor more than twenty (20) years.").

for sexual abuse in the first degree are qualifying sexual felonies for purposes of KRS 532.110(1)(d).[4] There is also no question that Stambaugh's crimes were committed against multiple victims, three to be exact, as is required for KRS 532.110(1)(d) to apply. Accordingly, there is no doubt that the provisions of KRS 532.110(1)(d) apply to Stambaugh.

In plain language, in this case KRS 532.110(1)(d) would appear to require Stambaugh to be sentenced to four consecutive ten-year sentences for a total maximum sentence of forty years' imprisonment. On the other hand, subsection (1)(c) of that same statute would appear to cap Stambaugh's sentence at a maximum of twenty years' imprisonment. This appears to create an inconsistency between the two subsections of the statute.

■ Of course, we must attempt to harmonize seemingly divergent statutory directives *if it is reasonably possible to do so*.[5] And Stambaugh contends the two subsections at issue can be harmonized. According to Stambaugh, the mandatory consecutive sentencing provision of KRS 532.110(1)(d) applies only until the general sentencing cap of KRS 532.110(1)(c) has been met. In other words, the trial court in the case at hand would have been required to sentence him to consecutive terms of imprisonment until the total term of imprisonment reached twenty years— the cap under KRS 532.110(1)(c)—after which any remaining sentences must be ordered to run concurrently. Ultimately, we conclude that Stambaugh's proposed

reading is a reasonable way to harmonize the two subsections of the statute.

All subsection (1)(d) says is that sexual offenses must run consecutively. For example, three convictions for sex abuse in the first degree, where it is a Class D felony, with a maximum penalty of five years (and a maximum "extended term" of 20 years under the PFO statute), could all be run consecutively with no impact on subsection (1)(c) at all. Thus when the consecutive sentences for lesser sex crimes are less than 20 years, the two sections obviously cannot be in conflict. The intent behind (1)(d) was to remove judicial discretion when sentencing sex offenses generally by requiring that the sentences be run consecutively. Had (1)(d) not been enacted, sentencing courts, under the text of subsection (1) could run lesser sexual offenses concurrently, leading to a scenario where a trial court could, at the extreme, sentence a sex offender convicted of fifty counts of sex abuse to one year in prison. The legislature acted to remove that possibility in sex crime cases, reflecting the general public's view that these crimes are particularly heinous, and sex offenders should not be able to receive unduly light treatment. However, none of this conflicts with the purpose of (1)(c).

For years, state governments, and particularly Kentucky, have struggled with prison overcrowding. Incarceration carries a steep cost to the taxpayer. In enacting (1)(c), the legislature determined that there must be a reasonable limit on the amount of time given for punishment, doing a cost-benefit analysis. In doing so,

4. KRS 532.110(1)(d) applies to felony sex crimes, as defined in KRS 17.500. KRS 17.500 defines a *sex crime* as, among other things, "[a] felony offense defined in KRS Chapter 510" KRS 17.500(8)(a). Sexual abuse in the first degree is codified as part of KRS Chapter 510, specifically at KRS 510.110.

5. *See, e.g., Commonwealth v. White*, 3 S.W.3d 353, 354 (Ky.1999) ("Where there is an apparent conflict between two statutes, the Court is obliged to attempt to harmonize the interpretation of the law so as to give effect to both statutes.").

the legislature focused on the *aggregate* of consecutive terms, and specifically limited the aggregate time served to not exceed the maximum length for the longest extended term which would be authorized under the PFO statute for the highest class of crime for any of the convictions. The legislature even went further, and made sure that a sentence of life could not be imposed by expressly stating that "in no event" could the aggregate of sentences exceed 70 years. The mandatory nature of the "in no event" language and the use of "shall not" in (1)(c) indicate the strength of the legislature's intentions about aggregate sentences.

Admittedly, subsection (1)(d) was enacted after (1)(c), and the legislature did not state whether (1)(c) controlled over (1)(d) (though it clearly could have). But neither did the legislature say that (1)(d) controlled over (1)(c). Such a statement was unnecessary, because the mandatory language in (1)(c) speaks for itself, and the intent of (1)(d)—to prevent light sentences in sex offenses—is not harmed by limiting the aggregate length of time to serve any more than any other category of felony. The two sections operate independently of each other until the highest classes of sex offenses become the convictions. Unless the legislature intended to eviscerate (1)(c) in sex offense cases, there is no reason to read more into (1)(d) than is there. The language in (1)(c) is clear and mandatory, and can certainly be applied to sex offenses the same as any other type of offense. Since the two subsections have entirely different purposes, it is not surprising that the legislature saw no need for undue verbiage.

It is clear, then, that the legislature intended for sentencing judges to run sex offense sentences consecutively, but with a limit on the allowable aggregate sentence. Under such a reading, this Court gives effect to both subsections of KRS 532.110, which we are required to do, if possible, when construing a statute, and also here under the rule of lenity.

As such, the trial court's imposition of consecutive sentences but with an maximum aggregate of twenty years was not erroneous.

**B. *No Reversible Error in Refusal to Admit Letter***

Stambaugh contends the trial court erred by refusing to allow him to attempt to impeach M.R.S. with an undated, unsigned letter she had purportedly written to Stambaugh. The letter generally provides that its author loved the recipient, who is repeatedly referred to as "Dad" or "Daddy." The trial court refused to allow Stambaugh to impeach M.R.S. with the letter because it had not been provided to the Commonwealth in discovery.

On appeal, the Commonwealth contends that: (a) the issue is not properly preserved for review because Stambaugh raises on appeal a different reason for the letter's admissibility than he did at trial; (b) the trial court correctly excluded the letter because it was not properly disclosed in discovery; and (c) any error is harmless. Although the letter appears to have not been subject to disclosure in discovery and the issue appears to have at least arguably been preserved, we ultimately agree with the Commonwealth that any error is harmless.

We begin by noting that it appears that Stambaugh is correct when he asserts that the letter was not subject to reciprocal discovery under our precedent. The reciprocal discovery order issued by the trial court required Stambaugh to provide the Commonwealth with "reciprocal discovery as specified in RCr [Kentucky Rules of Criminal Procedure] 7.24(3)(A)(i)." We recently held that a defendant was not re-

**440**

quired in discovery to provide the Commonwealth with audiotaped statements of a witness because the discovery agreement in that case, like the one at hand, only required a defendant to provide reciprocal discovery under RCr 7.24(3)(A)(i), a rule that we determined "only required Appellant to provide the Commonwealth with scientific results[,]" and, thus, did "not apply ... to the audiotaped statements."[6] The Commonwealth does not attempt to distinguish *Gray*.[7] And *Gray* plainly applies to this case. Because the letter at issue in the case at hand is not a scientific result or report, the trial court may well have erred by excluding it as a purported discovery violation by Stambaugh.

▮ It appears that this issue was, at least arguably, adequately preserved for our review. The Commonwealth contends it is not properly preserved because it alleges that Stambaugh did not raise unequivocally to the trial court our holding in *Gray*. From the brief bench conference held on this issue, we know that the question of whether the letter was encompassed by the discovery order was brought before the trial court, although without a discussion of our holding in *Gray*. So we conclude that the issue was at least arguably preserved because the parties' arguments "adequately alerted" the trial court to the issue.[8] The best method of preserving an issue, of course, is to raise it specifically and completely to the trial court and then to present the same argument(s) to an appellate court. Better practice, therefore, would have been for Stambaugh to

have cited *Gray* to the trial court. But Stambaugh is ultimately not entitled to relief, even if we assume the issue is adequately preserved, because any error by the trial court was harmless.

M.R.S. specifically testified that Stambaugh placed his penis—which she testified Stambaugh called his "mean chocolate," a fact that M.R.S.'s mother corroborated—inside her vagina, which she called her "kitty." M.R.S. also testified that she saw Stambaugh place his tongue and fingers on H.M.S.'s "kitty" and, furthermore, that she (M.R.S.) saw Stambaugh place his finger in M.E.S.'s "middle part." M.R.S. also testified that Stambaugh threatened to harm her if she disclosed that sexual contact. M.R.S.'s mother also testified that she saw Stambaugh touching H.M.S.'s "kitty" with his finger and with his penis. The mother also testified that she saw Stambaugh touch M.E.S.'s "kitty."

In an effort to counteract this damning testimony, Stambaugh was purportedly going to use the letter, which he claims M.R.S. wrote to him, to: (1) impeach M.R.S. regarding whether she had written him a letter since he left her home, (2) impeach M.R.S. regarding her denial that she referred to Stambaugh as "Dad" or "Daddy," and (3) impeach M.R.S. regarding her denial that she told Stambaugh she loved him.

Although perhaps impeachment on those three matters would have had some theo-

**6.** *Gray v. Commonwealth,* 203 S.W.3d 679, 685 (Ky.2006). *See also Jones v. Commonwealth,* 237 S.W.3d 153, 156 (Ky.2007) (explaining that in *Gray,* "[w]e ... expressly rejected the notion that RCr 7.24 encompasses anything not explicitly covered by the rule by holding that RCr 7.24(3)(A)(i) applies only to results or reports of scientific tests or experiments." (internal quotation marks omitted)).

**7.** In fact, the Commonwealth does not cite *Gray* in either its initial or reply briefs.

**8.** *Hardin v. Commonwealth,* 428 S.W.2d 224, 226 (Ky.1968) ("While the objections were not sharply to the point we think they adequately alerted the trial judge to the proposition....").

retical probative value, none of those three areas of impeachment would have contradicted M.R.S.'s testimony about the sexual contact Stambaugh foisted upon her. At most, those three areas of impeachment would have highlighted M.R.S.'s affection for Stambaugh. Whether M.R.S. did or did not have affectionate feelings for Stambaugh is irrelevant to whether Stambaugh subjected her to sexual contact.[9] Moreover, two physicians testified that they saw a "notch" in M.R.S.'s hymen.[10] One of the physicians described such a notch as being unusual, although that same physician did agree that things other than sexual contact could conceivably have caused such a notch.

Considering all the evidence in this case,[11] we conclude that any error in the exclusion of the letter was certainly harmless. In other words, we conclude that the trial court's refusal to permit Stambaugh to impeach M.R.S. with an undated, unsigned letter purporting to show that M.R.S. missed and loved Stambaugh did not "substantially sway[ ]" the verdict in this case.[12]

---

**9.** *See* KRS 510.110(1)(b)(2) (providing that a person is guilty of sexual abuse in the first degree when he or she "subjects another person to sexual contact who is incapable of consent because he or she ... [i]s less than twelve (12) years old").

**10.** Stambaugh goes to great lengths to argue that one physician disagreed with the other regarding this notch. The disagreement concerned whether the notch was at the seven o'clock position or at the five o'clock position, an issue that is quite secondary to the larger issue of whether such a notch existed at all.

**11.** We have considered the strange testimony of the children's mother in making our harmless error determination. Essentially, the mother, who was herself charged with complicity to Stambaugh's crimes and pleaded guilty to lesser charges, stated that she, along with her sister, had concocted the allegations against Stambaugh. But the mother also tes-

---

## IV. *CONCLUSION*

For the foregoing reasons, Larry Joe Stambaugh's four convictions and sentences for sexual abuse in the first degree are affirmed.

ABRAMSON, SCHRODER, SCOTT and VENTERS, JJ., concur.

MINTON, C.J., dissents by separate opinion in which CUNNINGHAM, J., joins.

MINTON, C.J., dissenting:

I agree with the majority that there is a conflict between KRS 532.110(1)(d) and KRS 532.110(1)(c). But I strongly disagree with the majority's resolution of that conflict. So I respectfully dissent from the majority's conclusion that the general sentencing cap of KRS 532.110(1)(c) controls the mandatory consecutive sentencing provision for certain sexual offenders set forth in KRS 532.110(1)(d).

Of course, because the interpretation and construction of statutes is a matter of

---

tified that she would never have set up Stambaugh and that if her daughter said something happened, then something happened. The mother's vacillating story, which includes an accusation, a recantation, and a recantation of the recantation, does not alter our conclusion regarding the harmlessness of any error in refusing to permit Stambaugh to impeach M.R.S. with the letter.

**12.** *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky.2009) ("A nonconstitutional evidentiary error may be deemed harmless ... if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error.").

Indeed, we also would find the error to be harmless beyond a reasonable doubt if we assumed, as the Commonwealth seems to do in its reply brief, that the error in excluding the letter is somehow of constitutional magnitude. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

law, we owe no deference to the trial court's construction of KRS 532.110.[1] Instead, we should resolve this statutory conflict ourselves by using the accepted canons of statutory construction. I conclude that the majority's conclusion runs afoul of two of those canons of construction.

First, the majority's conclusion is contrary to the canon that provides that specific statutes control over general statutes. Among the most basic tenets of statutory construction is the familiar rule that when construing two conflicting statutes involving the same subject matter, "the more specific statute controls over the more general statute."[2] Clearly, KRS 532.110(1)(d), which deals only with mandatory consecutive sentences for certain sexual offenders, is far more specific than the general sentencing cap set forth in KRS 532.110(1)(c). The majority does not address this important canon of construction. It simply cannot be squared with the majority's conclusion.

Second, the majority's conclusion is contrary to the canon that counsels that later-enacted statutory provisions take precedence over older statutory provisions dealing with the same subject matter.[3] KRS 532.110 was first enacted in 1974. But the provision in subsection (1)(d) mandating consecutive sentences for some defendants convicted of sexual felonies, such as Stambaugh, was not enacted until 2006, by which time the sentencing cap in subsection (1)(c) had already been enacted.[4] Be-

cause it is the later enactment, the directive in KRS 532.110(1)(d) mandating that felons such as Stambaugh be sentenced to consecutive terms of imprisonment must control over the contradictory general cap on sentences found in KRS 532.110(1)(c). The majority acknowledges in passing that subsection (1)(d) was enacted after subsection (1)(c) but, nonetheless, concludes that subsection (1)(c) controls subsection (1)(d).

And what authority does the majority cite for failing to employ these two basic tenets of statutory construction? None.

The majority merely divines that the General Assembly must have wanted the general cap found in subsection (1)(c) to control over the specific, mandatory consecutive sentencing provisions of subsection (1)(d) because our prisons are crowded and the costs of incarceration are high. Although the correctional facilities of this Commonwealth may be crowded and expensive to operate, the majority is unable to cite anything in either the record of this case or any prior decision of this Court to support the majority's conclusion that these factors were ever considered by the General Assembly when it enacted the mandatory sentencing provision of subsection (1)(d). Indeed, why would the General Assembly logically have enacted any such mandatory consecutive sentencing statute if it had been concerned with prison costs and overcrowding? It strains credulity to conclude that the General As-

1. *See, e.g., Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.,* 238 S.W.3d 644, 647 (Ky.2007) ("The trial court's and Court of Appeals's construction of statutes is also entitled to no deference on appeal because statutory construction is a matter of law subject to a de novo standard of review.").

2. *See, e.g., Light v. City of Louisville,* 248 S.W.3d 559, 563 (Ky.2008).

3. *See, e.g., Bowling v. Kentucky Dept. of Corrections,* 301 S.W.3d 478, 491 n. 4 (Ky.2009)

("While we conclude that KRS 13A.100(1) and KRS 13A.120(1) are fully reconcilable, it is worth noting that were they thought to conflict, the more recently enacted statute, KRS 13A.100(1), which the General Assembly adopted in 1990 (1990 Ky. Acts Ch. 516), would control over KRS 13A.120, which was adopted in 1986 . . . .").

4. *See* 2006 Ky. Acts Ch. 182 (H.B.3) § 47.

sembly would *ever* have determined that prisons were too crowded or too expensive to house recidivist sexual offenders such as Stambaugh.

There is nothing in either subsections (1)(c) or (1)(d) of KRS 532.110 that plainly states, or even hints, that the mandatory consecutive sentencing directive in subsection (1)(d) must yield to the general cap on sentences in subsection (1)(c). If the General Assembly had intended for the specific, new mandatory sentencing provision of subsection (1)(d) to be subordinate to the general, existing statutory cap found in subsection (1)(c), would not it have plainly said so? After all, the traditional methods of statutory interpretation would have, until today, caused the later-enacted statute to take precedence over any conflicting, earlier-enacted statute. And we, as a reviewing court, must make the fundamental presumption that the General Assembly was aware of its previous enactments when it enacted a new statute on the same subject.[5]

The majority opines that the General Assembly did not say that the cap in (1)(c) controlled over the mandatory consecutive sentencing provision in (1)(d) because "[s]uch a statement was unnecessary, because the mandatory language in (1)(c) speaks for itself...." I disagree.

First, the language in subsection (1)(d) is also mandatory in nature, as evidenced by the presence in that subsection of the mandatory verb *shall*.[6] Why is the earlier-enacted, less specific mandatory language contained in KRS 532.110(1)(c) somehow more mandatory than the later-enacted, more specific mandatory language in KRS 532.110(1)(d)?

Second, I believe it far more likely that the General Assembly believed a statement as to which subsection of KRS 532.110(1) would control was unnecessary because it relied upon any reviewing court to follow the canons of statutory construction regarding later-enacted and more specific statutes controlling earlier-enacted and more general statutes. Although better practice surely would have been for the General Assembly to have made its intent unmistakable and plain, I believe the majority errs by concluding that the General Assembly's silence supports its conclusion.

In summary, the majority correctly notes that there is a conflict between subsections (1)(c) and (1)(d) of KRS 532.110. But I believe the majority errs by holding that the older, more general provision of subsection (1)(c) of that statute takes precedence over the more recently enacted and more specific subsection (1)(d) of that statute. So I believe the trial court was required to apply KRS 532.110(1)(d) to sentence Stambaugh to consecutive terms of imprisonment for all of his qualifying felonies (*i.e.*, a cumulative sentence of forty years' imprisonment).

I would reverse Stambaugh's sentence and remand this matter to the trial court for re-sentencing in accordance with KRS 532.110(1)(d). Because the majority regrettably comes to a different conclusion, I respectfully dissent from section III(A) of the majority opinion.

CUNNINGHAM, J., joins.

---

**5.** *See, e.g., Rose v. Turner,* 301 Ky. 272, 275, 191 S.W.2d 397, 398 (1945) ("It is fundamental that in the enactment of a more recent statute, prior enactments on the same subject are presumed to have been in the mind of the Legislature.").

**6.** *See* KRS 446.010(30) ("As used in the statute laws of this state, unless the context requires otherwise ... "Shall" is mandatory....").